Mr. Ginger, good morning to you. Welcome. Good morning. Proceed. Thank you. There are three issues on this appeal. I plan to focus my argument today on two of them, double patenting and best mode. If I have time, I'll comment on the inequitable conduct, but I suspect I won't have time. So let me start with the double patenting argument. Could you back up just one moment before I begin? Which claims was Teva found to infringe? I can't give you the exact numbers, but I believe Teva infringed any claim that encompassed Celicoxib. Teva sought FDA approval to market and sell a generic form of the drug, Celicoxib, which is included in most of the genuses and the genus claims and is also the subject of certain Celicoxib-specific claims. So any of the claims that had Celicoxib in it. Well, how does it help you to win on the double patenting issue because that only affects the 068 patent and the findings of infringement with respect to the other two patents would be unaffected by that? Well, it matters quite a lot to invalidate the 068 because it means that Teva will be able to go on the market a year and a half sooner than it would. Wait, why is that true? The 068 patent expires after the 068 patent expires. I see what you're saying. And indeed, that's the whole point. The district court found, and it really is clearly correct, that the claims ensued in the 068 patent are not patentedly distinct from the 165 claims. And as a matter of law, as this court ruled in the Geneva case, a method of using a composition of matter is not patentable over a claim to the composition itself where the same use is disclosed. Indeed, the Geneva court, citing the CCPA, said it would shock one's sense of justice if an inventor could receive a patent upon a composition of matter, setting out at length in the specification the useful purposes of such composition, and then prevent the public from making any beneficial use of such product by securing patents upon each of the uses to which it may be adapted. That is the situation we have here. Claim 5 of the 165 patent claims a pharmaceutical composition comprising principally a therapeutically effective amount of a compound, where the compound is selected from a group that includes the drug cellococcin. Now, therapeutically effective was stipulated by the parties to mean an amount that would elicit an anti-inflammatory or an anti-pain response. So the utility of these compositions claimed in the 165 patent is included in the claims itself. Each asserted claim in the 068 claims methods of treating inflammation or inflammation-associated disorders by administering a therapeutically effective amount of, among other things, cellococcin. So we have exactly the situation that was described in Geneva. The 068 is not patently at stake. Now, ordinarily— Talk about 121. That's the key question here, whether there really is a restriction that was imposed and a lack of confidence. Sure. In Geneva, this Court recognized that section 121, if it applies, gives the patentee a windfall. In this case, as we discussed earlier, it allows effectively the claims of the 165 to be pushed out for another approximately year and a half. Now, because it results in a windfall, this Court applies, as it said in Geneva, a strict test for the application of 121, and part of that strict test is confidence. Section 121 only applies to patents that are filed as a result of a restriction requirement imposed in an earlier application and is consummate. How many restrictions do you think were imposed in connection with the 823? There were two kinds of restrictions imposed. The first kind was a restriction to the type of claim. In other words, restrictions separating compound, composition, and method. And you don't have any problem with— No, there was consonance with that. That's okay. The second restriction was an election of species requirement. The examiner found that all of the claims—the original application encompassed compound, composition, and method. Okay, so why does the election of species restriction that you see in there apply beyond the compounds patent, beyond the 823? Because that's how Section 121 works. Well, I don't see that's an adequate answer. No, no, I'm explaining. I mean, 121 says that certain categories of patents cannot be invoked in an effort to invalidate another patent. The universe of patents to which 121 applies are those that—let me get the language of the statute. But I think the question I'm asking is there's an election of—you say there's an election of species requirement here. Let's assume that that's true. Then the question is, is the election of species requirement applicable to the composition and method claims? In other words, does it apply to the 068? And what's the basis for believing that there's an election of species requirement that was designed to carry over to these other—to the composition and method claims? Because the examiner found that the composition, the compound, and method claims all suffered from the same problem. They all encompassed a genus of compounds that was too large. Okay, where do I find that? In the first office action, Your Honor, which is here. Too large for what? Too large for workload for the examiner or too large to be patentable? The latter. They said they encompassed patentably distinct species. In other words, 121 authorizes examiners to say that you have claimed more than one distinct patentable invention. And that is what the examiner found here. And he found that not only with respect to the compound claims of the original application, but also with respect to the— How do we know the also part of it? You're saying it, but— —of claims that encompassed patentably distinct species. And the consequence of that would be that you'd have to file divisional applications? The consequence would be you would have to file divisional applications in which you could not exceed—in order for 121 to apply, you could— So you'd have to—each patentably distinct species would have to be the subject of a separate divisional application, is what you're saying? Only if 121 were to apply. It doesn't affect the validity of the patent. For example, the 165 patent— No, but in terms of the restriction requirement, if I understand correctly—maybe I'm not understanding correctly—what you're saying is that the examiner imposed a restriction. Correct. The consequence of that would be that you should take each patentably distinct species and turn it into a divisional application. Well, again, not necessarily, because the examiner later clarified and said, I'm going to treat as an acceptable genus this—what we've all referred to as the general concept. Yeah, yeah, yeah, I understand. But the basic concept—do I have the basic concept right? The basic concept is that the claims of—all three kinds of claims in the original application—the genus claims—encompassed such a large group of compounds that it included— So they had to be broken up and made into separate divisional applications. Correct. Alright, so where do we find the language that imposes that restriction? That's the question. In the generic concept that was— No, no, in here, in the record. What page? In his office action. Where is the language that makes it clear that the species-genus problem requires further separate applications? The examiner in the office action said, these claims encompass patentably distinct requirements. So I will require, under section 121, I will require the applicant to elect a species, a single compound. And then I will take that, and I will define a narrower genus, and that's exactly what— Where? Your problem is this. Maybe he said this with respect to the compounds, but where does he say this with respect to the compositions and the method of use? By saying it with respect to— No, no, where? No, no, just the language. What language are we talking about? Tell us what the language is, and then you can argue about what it means. I'm reading now from page, in the appendix, 26390. Which line? 3? It's certainly not 1. It's 3. Page 26390. The examiner says, in response to the restriction requirement of paper number 6. Now, paper number 6 is the office action where he said, all three categories of claims—composition, compound, and method of use claims—encompass patentably distinct species of compounds. Because all of them, all of the claims, are defined with reference to compounds. The only inventive aspect of the composition and method claims are these compounds. And so he said, in response to the restriction requirement of paper number 6, applicant has elected group 1, which is compounds, and the species of claim 40 with traverse. And then he proceeds to define what the parties have been referring to in this case as the generic concept. The generic concept is the restriction that what became the 823 patent was restricted to the compounds that are identified in the office action that I've just directed the court's attention to. For 121 to apply, in other words, to avoid having the 165 patent serve as the basis for double patenting rejection of the 06A. The plain language of 121, I suggest, requires the 165 to be consonant with this restriction. I'm having trouble here. This has to be clear, and right now it's not clear to me. Now, it may be that I don't understand, but I'm not seeing how this applies beyond the compounds. What am I missing? I think what you're missing is that the examiner said that the problem to which this is a response was a problem with all three categories of claims. Where does he say that? He says that. I have it here. Page 26325, 23626. 26325. 23626. He says 236 or 263? 26326. He says claims 1. Wait, wait, wait, wait. 26326. Okay. He says claims 1, 16, 21, and 27 are generic to a plurality of disclosed, patently distinct species, comprising, for example, and it goes on. Now, those four examples are the broadest examples of compound, composition, and method claims. So the examiner found not just that the compound claims in the original application encompassed multiple patently distinct species. He said the composition and method claims did as well. And to that reason, and he also goes on to say later in the, he goes on to say that the evidence required. Wait, wait. Because he refers there, he says the method of treating fever using 5, the compound of example 1? So basically what you're saying is that if you, if you go back and look at the cross-references, if you will, you could figure out that it covers not just compounds, but it also covers compositions and methods. Sure. And is that good enough for it to be clear? Oh, I think so. I think so. I mean, it's just too short office actions. Anybody reading this file history would see that, I suggest. Anybody? I only have, I have less than a minute left. I'd like to save some, some time for my rebuttal if I could, but I also, I also want to be responsive to your questions. Go ahead. Go ahead. You want to talk about the. Fesmo. I'll speak briefly about the Fesmo, Your Honor. The district court found that it was undisputed that the inventors here in fact preferred compounds and compositions that were COX-2 selective as used and that performed satisfactorily in what we call the adjuvant arthritis test. Now, it's important to keep in mind that these compounds were not always COX-2 selective as used. Take selicoxib, for example. The evidence is quite clear that depending on how much of it, the concentration of selicoxib in the system, it was not at some dosage, even some doses within the most preferred range identified in the patent, it was not COX-2 selective. In the heart of our best mode argument. Well, I think you've got an interesting argument with respect to some of the genus claims here that they didn't tell you how to, you know, what to look for and to, to, to basically they didn't tell you how to identify the preferred embodiment. Not that they'd yet arrived at it, but they developed a method for getting to the preferred embodiment, which was COX-2 selectivity. The problem is that on a couple of these claims, there's a specific compound claim and, and your best mode argument with respect to that, it seems to me is a bit different in the sense that you're saying they didn't tell us the dosages that would lead to COX-2 selectivity, correct? Not quite. I mean, with regard to the, to the selicoxib specific claims, for example. The court in the Bayard test said that one of the aspects of it, you can prove a best mode violation by proving that the patent fails to disclose aspects of making or using. You have to be, you've got to be clear here. I'm talking about the specific claims. They say, they say, even if we lose on the genus claims, there are a couple of these claims here that are specific, they identify specific compounds. We don't have a best mode issue with respect to those, correct? They do argue that, but it's. Right. Okay. What's the answer to that? Your answer to that is dosage, right? The answer to that is they need, it is the dosage in the sense that COX-2 selectivity is a function of the method of using selicoxib. In other words, you can use selicoxib in a way that is COX-2 selective and you can use selicoxib in a way that isn't. Even within what they disclose in the patent is the most preferred dosage range. And if best mode, a best mode violation is, consists of failing to disclose an aspect of using the claimed invention and the undisclosed matter materially affects the properties of the claimed invention, then you have a best mode violation. I suggest even with respect to the specific compound claims, they have failed to disclose that you have to use selicoxib in a way which makes it COX-2 selective in order to gain the, to achieve the results that they have touted in this patent. Which is not only the treatment of inflammation, but doing so in a way which reduces side effects. If you don't use selicoxib in a way which makes it COX-2 selective, you don't get that benefit of reduced side effects. That's why these patents fall out of the best mode requirement. I want to pick up on that point a second. This Bayer test talks about the material aspect of making and using. Is there a difference between a property of the compound itself and what effect it's going to have? And maybe that question doesn't make sense. It's a non-patent lawyer's question, I'm sorry. But basically what you're saying is that if you use a particular dosage it's going to work in this way. If you use a different dosage it's going to work in that way. Why is that the type of property that the Bayer test is talking about? Because it goes to achieving the utility that's claimed for these inventions. In other words, all of these patents say, and DBO-68 says it explicitly, these compounds are an improvement over aspirin and other common NSAIDs. Because you not only reduce fever or reduce pain, but you do so in a way which doesn't cause GI side effects the way chronic use of aspirin has done in many patients. But that's only true if you do use these drugs in a particular way, which is related to the dosage. So to achieve the goals of the invention, and the best mode of this invention, I suggest, is the mode that achieves the goals of the invention. They haven't explained how to achieve that. And for that reason it is a best mode violation. I'm way over my time. I hope I can get at least a couple of minutes. Thank you. All right. Thank you, Mr. Dinger. We'll, in view of the complexity of the case, restore your four minutes of rebuttal. Ms. Ben-Ami, good morning to you. Welcome. Please proceed. Thank you. May it please the Court, I apologize. I couldn't even speak on Monday, so I apologize if I can't be here. We're hearing you loud and clear.  Thank you, Your Honor. We need to focus on best mode. It's what was the subjective best mode in 1993. Best mode is not what did you learn ten years later. Yeah, but suppose that there's no preferred embodiment at the time, but that the patent applicant knows how to get the preferred embodiment, has a criterion for the preferred embodiment, and is testing to get to that point. Are you saying there's no obligation to disclose how to secure the preferred embodiment even though the applicant has a plan and knows that this plan will lead to the preferred embodiment? I'll take that question as it applies to the generic claims because it wouldn't apply to the generic claims. I think that the law is, best mode is a very specific law, that if you don't have a preferred embodiment, you're not obligated to disclose a preferred embodiment. That is step one. Have we ever considered the question of whether you have to disclose a mechanism for identifying a preferred embodiment? I have not found any case that said that that's a best mode issue. One way or the other? One way or the other. I would ask for us to look at it this way. Best mode is the best mode of what is claimed. What is claimed here, in the first patent, are compounds. What Teva is arguing is that there is a best mode requirement to explain your personal discovery process leading you intellectually to your invention because there is no dispute that the invention was disclosed and there was no best mode for which was the preferred embodiment nor was there a best mode for how to synthesize it that was withheld. Any of the traditional models. The question here is, this is not a patent on a method of discovering drugs. These are not patents on methods of a mechanism of action in the body. These are not methods of assay claims. You might have different best mode issues in those cases. But where a claim is to a compound, how I, as an inventor, figure out how to get to my invention is not the best mode of my invention. The best mode of my invention is my invention. Yeah, but it seems to me that what your argument is for is a rule that tells people to file applications before they've arrived at a preferred embodiment and then they don't have to disclose it. I mean, the trade in the patent law is to disclose the invention so that when the patent expires, other people can reproduce it. And the problem is, if you have this wide range of compounds and you have a mechanism for identifying the preferred embodiment, you file before that work has been done and the next week you identify the preferred embodiment. Under your theory, you don't have to disclose anything, right? Well, I think there's a premise to your question that I wouldn't agree with, which is that there had a method that if they only used it, they would get to the preferred embodiment. Well, no, no, I understand, but this is a hypothetical. So this is a hypothetical. If they have a method to get to the preferred embodiment, they file a patent application knowing that one week later they're going to identify the preferred embodiment. You say that's not a best mode. If you don't have a preferred embodiment, you don't have to disclose a preferred embodiment. Even if you know you're going to get one next week. I don't know how anyone ever knows in science that next week they're going to get a preferred embodiment because if you look at the evidence in the record in this case, I'm not making it hypothetical, the evidence in this case discloses that the inventors, as they were doing this research, came up with COX-2-selective drugs that didn't turn out to be anti-inflammatory, that were toxic, that had too long a half-life. But you're rejecting the premise of my hypothetical, that you know that next week you've got 12 compounds, you've done the testing, you know that next week the test results are going to come in, you're going to know which one works, and you file the application and say, well, too bad, we didn't know at the time that we filed the application which one of these 12 was the preferred embodiment. And the fact that we learned next week, we don't have to tell you. Well, your hypothetical suggests that they knew that one of the 12 was the preferred embodiment. No, one of the 12 would be. But you're saying, I know that I have 12, one of them will be my preferred embodiment. Do they have to disclose that? I don't know the answer to that, because there's no case law on that, but I do know that in this case they had 30 compounds that they did disclose as examples. The compounds they had, they did disclose. They did disclose specific compounds, independent claims. So it's not a situation where there is no disclosure of any compounds, that there's no disclosure of any testing. What the court is suggesting by the question, hypothetical, is that you must disclose all your discovery process because maybe then someone in the future can come up with what they perceive is their best mode, which may not be what you perceive is your best mode. Best mode is a very specific requirement. It's not written description. It's not enablement, as the court knows. What did the inventors believe their best mode to be in November 1993? And that's it. That is the law on that area. It's not a broader policy issue. Best mode is not a broader policy issue. It's a statute. Yeah, sure it is. Come on. I mean, there are policy considerations involved in construing best mode. I mean, the idea that the patent law has nothing to do with policy, it seems to me is dead wrong. I didn't say that, Your Honor. I didn't say that patent law has nothing to do with policy. I said best mode does not have to do with a policy of what you want in the future. Best mode is very defined as to time. That is, I think, accepted law, that best mode is what you know, November 1993. And in these patents, what they knew was you test for COX-2 selectivity, it doesn't necessarily work. COX-2 selectivity is not an absolute. I think that there's a confusion in the discussion here. It's a ratio. You may have some COX-1 inhibition, yet it's a good anti-inflammatory. It's an art. It's not a we follow A to B to C to D, voila, you're done. It's an art because there's a balance of different properties. Yeah, but you agreed that the preference for COX-2 selectivity wasn't disclosed in the patent, right? The COX-2 test was not disclosed in the first two patents. And you admit that the inventors did have a preference for COX-2 selectivity. Among other things. Among other things. It was one of their testing mechanisms recognizing that they had multiple programs going on where they were testing other mechanisms. This was not, there wasn't only one part of a program, one program not looking at other enzymes. There was one group that was saying, I'm going to focus on COX-2. A similar group is going to focus on something else. A similar group is going to focus on something else. This group was focusing on COX-2, and when they got their results, they found out, you know, A doesn't follow to B doesn't follow to C. You can't say, I have COX-2 selectivity. I have anti-inflammatory with gastric sparing. They did disclose what their use was. Their use was, take these compounds. They, in our belief, will be anti-inflammatory. They will be gastric sparing. It's not a case where they said, oh, I know these will be good cholesterol drugs, and then instead they said, I'm going to disclose them as being anti-inflammatory. Their use, their goal, was not to make a COX-2 inhibitor. Their goal was to make a medicine which was anti-inflammatory and gastric sparing. That's what they believed their genus allowed for. If they did know that they were good cholesterol drugs but didn't disclose that, would that be a best known violation? That's an interesting question. That might be true. I don't know. Possibly for the composition claims. I'm not sure for the compound claims. Because a compound claim is to the compound itself. A composition claim is to, obviously, a pharmaceutical composition. And a claim, which says therapeutically effective, has been defined as only as an anti-inflammatory or for pain. So if you looked at what is claimed, because best mode always is based on the claim. For that claim, would anti-cholesterol be the best mode? If the claim is specific to the anti-inflammatory or pain, I would say no. If the claim was brought just as a drug for drug, I don't know if you could get a claim like that. That might be a different question. So really, best mode is always about the claim. And I think it would matter what the claim is. Put about 121. Sure. I think we need to look at the statute for a second. The last sentence of 121 says, the validity of a patent shall not be questioned for failure of the director of the patent office to require the application to be restricted to one invention. In other words, if an adversary believes that, boy, the examiner should have restricted the composition claims to a generic concept, that can't be a basis. Right. But they say he did. But he didn't. Well, so tell us why. I'll tell you why. Because if you look at it, the examiner said, I want you to restrict compounds, pharmaceutical compositions, and methods of treatment. Three separate restrictions. Three separate batches. And then I want you, whichever one you pick, to go ahead and pick an example. And then I'll decide what to do about it. There is no evidence in the record that the other way. Just pause there for a moment. So you agree that with respect to the composition claims and the method claims, there was a requirement of an election of species with respect to those two also? No. I don't agree with that. He said, you pick which one. And whatever you pick, I want you to start the ball rolling this way. He didn't say, for each one, I want you to do this. He said, you pick which one you're going to start with. And then we're going to deal with that. He did not say, I am going to create a generic concept for all three classes. Remember, it's the same examiner for the 165 patent and the 823 patent. So in other words, if they had decided to start with the method claims, then they would have had to apply the further restriction, or not restriction, whatever you call it, if you will, to that. But it only applied to whatever of the three alternatives they chose. This is what I understand happens from the record in the hypothetical. If they had chosen pharmaceutical composition claims first, they would have said, I'll pick this as an example. The examiner then, it would be up to him whether he would take the entire claims or less than the entire claims. He hadn't decided at that point how broad he would make the claims, because remember, he, after the restriction requirement, created this generic concept afterwards. So what the examiner could easily have done is said, on the compound claims, so remember how we examine, on the compound claims, it doesn't matter what the use is. If that compound exists in the art, he has to search the entirety of the art. On the pharmaceutical composition claims, he might say, well, these are pharmaceutical compositions, and I don't need to search the entire universe of art for compounds, so I feel that it's okay to have all of these in one class. Because the examiner can say, I can do it this way for this class of compounds, I can do it a different way for a different class.  It isn't really a restriction within the meaning of 121. No, he did do it for the compound claims. He ultimately did it for the compound claims, so I can't tell you that for the compound claims he didn't do it, but he didn't do it for the composition claims, and he didn't do it for the method claims. How would an election of species restriction create a issue under 121? If I understand correctly, the idea is that the election of species is just sort of an approach to examination, rather than a requirement that you break the application up into divisional applications. Help me understand how an election of species is a restriction, because I thought you just said it is. It can be or it can't be, and therein lies the difficulty. It can be, it can be a way of continuing. Give me an example so that I can understand how an election of species is a restriction. The examiner could say, I'm separating these compounds, compositions, methods. Now, I want to start with compounds. And within compounds, I'm telling you, I think they need to be further broken down under 121. So now I'm going to break down compounds that have an R group, A, B, C, versus compounds that have an R group, X, Y, Z. Why is that an election of species? He might start with saying an election of species is a way just to start. That's the problem. Well, it is a muddled thing, and I think in a situation where it is at all unclear, the statute says it must be, for you to say that there's no consonants, it's got to be a clear break, that here there's no clear restriction in the composition claims to this generic concept at all. The examiner never said for the composition claims, I want you to elect a species and have a generic concept on it. He never did it. It's the same examiner. He just never did it. He could have done it. But if he did it and he said, I want you to have an election of species and have a subgenus related to that, is that what he would do, what we're talking about? He could do that. He could do that. So what would be the consequence of that? Then he'd say that the other parts of the broad genus that was claimed has to be broken out because it's patently distinct inventions and put in divisional applications. Yes, and here's the interesting policy issue to that. If we follow the logic of what Tevin is saying, Tevin is saying that what Pfizer should have done is broken the 165 patent into two parts, an extended term. The 165 is all in one ball, all the claims. The claims that they say they're too broad. So they all die at the same time. They expire at the same time. If the examiner had further restricted, which he did not, then they would have been able to rely on 121 restriction in the composition claims and filed more patents in extended term. I thought there were divisional applications of the compound claims. Of the compounds, but not on the composition we're talking about. Tevin is arguing that for the composition, what should have happened, they're saying Pfizer, you did something wrong. Here's what should have happened. You should have broken the 165, what turned into the 165 patent, into different pieces and should have said there was a restriction. But if that had been the case, then Pfizer would be sitting here with more term, an extended term. So Pfizer is being criticized for not extending term. It's backwards to the policy. The policy is you want to try to keep the term within limits, and 121 is your safe harbor for not doing that. So here we have a situation where there was a restriction, composition, compound, and Pfizer did exactly what the restriction said. It took the compositions and put it in a separate patent. But your basic point is there were no restrictions, selection of species restrictions or subgenus restrictions with respect to the composition claims and the method claims. That is correct. And the examiner who prosecuted these later claims is the same examiner who did the compound claims and did the original restriction. That examiner, when it came to the composition claims, did not say now elect the species. That would have been his next step. If he wanted to do that and further restrict them, he would say elect the species. He didn't do that. He said, I can handle this. I'm fine with this. I'm doing it. And that is the evidence of record in this case. And for that reason, I do think that this is a pretty clear case that the record itself does not show that there's a lack of confidence. All right. Thank you. I would ask, Your Honor, if the court would like to continue on this one issue. I do have a couple of things to say just on this issue of raising the fact that CIP can never be a proper application under 121 if the court is going to address that. I believe the court's case law. I don't recall that Mr. Dinger argued that. He did not. He argued it on both sides, but since he didn't argue it, I think it's not in order for you to argue it. That's fine. Thank you. Thank you very much, Mr. Dinger. Four minutes. Thank you, Ron. First on BISC mode, point one, the district court  existed before the earliest patent application was filed. There is no doubt on this record that they preferred, that the inventors preferred compounds that selectively inhibited, that inhibited the COX-2 enzyme much more than the COX-1. The COX-1 was the good enzyme. The COX-2 was the bad one. And so that preference existed from the very beginning. The second point is that BISC mode does not require simply the disclosure of the preferred embodiment. This court in Bayer said that it also requires the disclosure of aspects of using the claimed invention that materially affects the property. And let me draw your attention to the Dana case. The Dana case involved a patent that claimed an engine that included a seal. What the patent didn't disclose is that if you didn't coat the seal with some kind of- Fluoride. Sorry? Fluoride. Fluoride, that's right. It would leak. Now, this fluoride treatment was not an embodiment of the claimed engine or even of the claimed, you know, the element of the valve. But the patent team was found to violate the BISC mode requirement by failing to explain to the readers that you have to do this in order to have it work as we contemplate, without leaks. This is, in a sense, the same situation. What the inventors didn't tell people was that in order to get the results that you want, you know, an engine that- a seal that doesn't leak, a drug, a composition that not only treats inflammation but does so in a GI-sparing way, you have to use them in a- you have to do something with them. You have to control the dosage so that it doesn't start to inhibit COX-1 as well as COX-2. They knew that from the outset and did not disclose it. And that is fundamentally why the first two patents are invalid for BISC mode violation. Now let me try one more time with 121. The way 121 reads, it applies to two kinds of patents. It insulates two kinds of patents. It prevents anybody from asserting two kinds of patents as a basis for invalidating another patent. First is a patent issuing on an application with respect to which a requirement for restriction under this section has been made. Now the 823 patent falls into that category. That was issued on an application in which restriction was made. Or an application filed as a result of such a requirement. The 165 patent was a divisional. It was the result of a restriction requirement imposed in the 823 application. That is what Pfizer is saying. The 165 patent, in order to qualify for the treatment of 121, must be consonant with the restriction requirement that resulted in the application that led to the 165. That restriction requirement, for these purposes, is the generic concept. And that's how we get to the argument that while the 165 patent, the examined 165 patent had no obligation to impose any other restriction requirement. We're not arguing 121 as a basis for invalidating 165. It's invalid for other reasons, but not for lack of consonants. The lack of consonants only matters because if consonants is lacking, then we can assert the 165 as a basis for a double patenting argument. And that's what we have done here. All right. We thank you both. We'll take the appeal under advice.